UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| JAMES MADDEN, | ) |
| Plaintiff, | ) Civil No. 08-26-ART |
| v. | ) |
| AMERICAN ELECTRIC POWER SYSTEM LONG-TERM DISABILITY PLAN, | ) **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff James Madden brought this action pursuant to the Employment Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, against Defendant American Electric Power System Long-Term Disability Plan. Madden received disability benefits for approximately a decade before they were terminated by the defendant on January 1, 2006. After unsuccessfully appealing the termination decision, Madden sought relief from this Court. The Court, however, concludes that the termination decision was not arbitrary and capricious. Therefore, that decision is AFFIRMED, and Madden's Motion for Summary Judgment, R. 19, is DENIED.

## FACTS

Madden worked for Kentucky Power Company as a meter reader. R. 20 at 2. Kentucky Power Company is a part of the American Electric Power system of companies (AEP), and by virtue of Madden's full-time employment he was eligible to participate in the Group Long-Term Disability Insurance Policy ("the Plan"). *Id.*

**1. Plan details**

The Plan is an employee welfare benefit plan as defined by ERISA, 29 U.S.C. § 1002(1). American Electric Power Service Corporation (AEPSC), another AEP company, is the sponsor and named administrator of the Plan. Administrative Record (A.R.) at 809. AEP pays the full cost of employee coverage, and all full-time employees are automatically eligible for coverage by the Plan. *Id.* at 773.

The record includes correspondence from multiple third-party administrators because from the time that Madden initially applied for and received benefits, AEP used three different third-party administrators. When AEP first awarded benefits to Madden in September of 1995, Aetna was the third-party claims administrator. *Id.* at 48–49. From October 1999 until February 2004, Employers Service Corporation was the third-party claims administrator. *Id.* at 26. In March of 2004, Broadspire Services, Inc. ("Broadspire") assumed administration of the third-party claims. *Id.* at 108. Finally, in the fall of 2006, Aetna took over Broadspire's disability claims administration business and assumed Broadspire's rights and authorities, making it once again the third-party administrator responsible for Madden's claims. *See id.* at 642.

Under the Plan, an employee receives 60% of his base monthly earnings for the period he meets the definition of disability. *Id.* at 775. The Plan provides two different definitions of disability. *Id.* at 773. For the first twenty-four months, disability means "an illness or injury that requires the regular treatment of a duly qualified physician that may reasonably be expected to prevent you from performing the material duties of your occupation." *Id.* at 773–74. Following the initial twenty-four month period, disability is defined as "an illness or injury that requires the regular treatment of a duly qualified physician that may reasonably be expected to prevent you from

2

performing the duties of any occupation for which you are reasonably qualified by your education, training, and experience." *Id.* at 774. Benefits end under the Plan if, after a request from the administrator, the employee fails to submit satisfactory written proof of objective medical information "which supports a functional impairment that renders you to be disabled." *Id.* at 779.

**2. Madden's Initial Award of Benefits**

Because of poor copy quality, it is unclear precisely when Madden first applied for long-term disability benefits under the Plan, but it appears to be sometime in 1995. At the time, he had been diagnosed with mitral-valve prolapse, glomerulonephritis, chronic renal insufficiency, chronic anemia, and circulating immune complex disease with multi-organ involvement probably secondary to endocarditis. *Id.* at 53–55. The diagnosing doctor further explained that Madden was progressively getting weaker and was unable to continue his job because he was totally and permanently disabled. *Id.* at 53.

On September 14, 1995, the administrator temporarily awarded Madden benefits pending a full investigation of his claim. *Id.* at 48. The letter granting benefits stated that he could receive benefits for the first twenty-four months if he was "unable, by reason of disease or accidental injury, to perform the duties of <u>your usual occupation</u>." *Id.* (emphasis added). It further stated that to continue receiving benefits beyond twenty-four months he must be "unable, by reason of disease or accidental injury, to perform the duties of <u>any reasonable occupation</u>." *Id.* (emphasis added). Finally, the letter explained, "Periodically Aetna will require additional information including objective medical evidence that you are totally disabled. On these occasions, Aetna will obtain current information from your attending physician or from a physician of our choice." *Id.*

**3. Review and Termination of Madden's Benefits**

Madden continued to receive disability benefits from the Plan for the next nine years. During this time, the Social Security Administration determined that Madden did not have "the residual functional capacity to perform any work," *id.* at 73, and notified him that he was entitled to monthly disability benefits from Social Security beginning in January of 1996. *Id.* at 100.

On June 13, 2005, Broadspire sent Madden a letter explaining that Broadspire had assumed the administration of the Plan. *Id.* at 148. The letter required Madden to submit proof of disability to continue receiving benefits under the Plan. *Id.* Madden submitted his records, including statements from two of his treating physicians: Dr. Ghazal and Dr. Chandarana. *Id.* at 208.

Broadspire reviewed Madden's file, including information his doctors provided, and determined that Madden was able to return to the work force. *Id.* Broadspire sent Madden a letter, which stated that its "peer physicians who specialize in Nephrology and Hematology/Oncology have reviewed this information and are in agreement with this determination." *Id.* Included in the record are the independent medical reviews of Dr. Lerner—who, based upon his review, concluded that Madden should be restricted to sedentary work in a controlled environment— and Dr. Hirsch—who, based upon his review, concluded that it did not appear that Madden had a functional impairment that would prevent him from working in any occupation. *Id.* at 227. Though Dr. Hirsch's analysis was quite brief, Dr. Lerner explained:

> Although the claimant has deteriorating renal function, his physical examination has been essentially unremarkable and unchanged over the last year. His blood pressure has been stable; he has minimal edema. He has not been hospitalized, and has been consistently described as being in no distress. Finally, the claimant was noted to cook, shop, vacuum, drive, read, goes to church, watches TV, and plays cards. Therefore, a functional impairment from any occupation does not exist at this time.

*Id.* at 260.

Broadspire used these independent medical reviews along with the information in the claim file and a telephone interview with Mr. Madden to conclude that multiple sedentary level jobs existed within sixty miles of Madden's home which paid at least 60% of his pre-disability wage and which he was capable of performing. *Id.* at 217, 240. Based on the conclusion that Madden was employable, Broadspire determined that Madden "no longer m[et] the Plan's definition of disability under the 'any occupation' standard." *Id.* at 217. Thus, Broadspire concluded that it should terminate Madden's benefits "effective January 1, 2006." *Id.*

Madden appealed this decision on May 8, 2006. *Id.* at 341. In his appeal, he explained that while some aspects of his health had stabilized over the preceding years, others had in fact worsened. *Id.* He stated that his heart was again causing him serious problems, and that the records did not adequately reflect the seriousness of his kidney problems and gout because he had been seen for these conditions by other doctors whose records were not accepted or considered. *Id.* He also submitted numerous medical records with his appeal. *See generally id.* at 346–531. Four independent, medical reviewers considered these records and all of them concluded that the records supported a finding that Madden was not disabled under the definition of the plan. *Id.* at 532–56.

After losing his first appeal, Madden filed a second appeal in August of 2006. In this second appeal, he stated that while he did not have many additional medical records to submit, his heart condition had worsened in the previous years, and he further stated that he was continuing to have pain and other issues from his Henoch-Schonlein Purpura. *Id.* at 635. Finally, he explained that although his kidney functioning had stabilized, it had stabilized at only 22% functioning, and his blood pressure was only normal because of the numerous medications he takes. *Id.* A new physician

5

(the seventh overall) reviewed these records and concurred with the previous six physicians that Madden was not disabled under the Plan. *See id.* at 678–80. Thus, this appeal was also denied. *Id.* at 648. Since Madden had exhausted all levels of appeals within the Plan, he filed this suit on December 28, 2007. R. 1.

## Standard and Scope of Review

The first step in an ERISA-governed benefits action is to determine the applicable standard of review—either arbitrary and capricious or *de novo*—based on the language in the benefit plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, both parties agree that the Court should review the administrator's denial of benefits under the arbitrary and capricious standard of review. R. 19 at 3; R. 20 at 8.

"[T]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). When applying this standard, this Court "must decide whether the plan administrator's decision was 'rational in light of the plan's provisions.'" *Id.* (quoting *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir. 1988)). Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985)). But simply because the arbitrary and capricious standard applies does not mean that this Court's review is inconsequential. *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005).

The Court's review of the administrative decision must be based only upon the material in the administrative record, and therefore, the Court "may not consider new evidence or look beyond

the record that was before the plan administrator." *See Wilkins v. Baptist Mem'l Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998); *see also Crews v. Central States*, 788 F.2d 332 (6th Cir. 1986) (limiting the review to the record before the administrator when the standard is arbitrary and capricious). The Court may consider the parties' arguments concerning the proper analysis of the evidentiary materials in the administrative record, but it may not admit or consider any evidence not presented to the administrator. *Id.*

## Analysis

In analyzing the plaintiff's claims, it is of no consequence whether the Court agrees or disagrees with the decision of the Administrator to terminate Madden's benefits. The Court must only determine whether the Administrator's decision was arbitrary or capricious. Here it was not.

Madden was undoubtedly in poor health—he had numerous conditions, the Social Security Administration found him to be disabled, and one of his doctors placed him on a kidney transplant list. Nevertheless, there was clearly evidence in the record from which an administrator could conclude that Madden was able to perform "the duties of any occupation for which [he was] reasonably qualified by [his] education, training, and experience." A.R. at 773–74. Specifically, the evidence shows that although Madden has a history of Henoch-Schönlein Purpura and nephrotic syndrome, his physicians noted his condition as stable. R. 20 at 5–6. Additionally, though Madden complained that his heart problems had recently worsened, an EKG and Holter Monitor conducted on May 9, 2006, revealed no significant heart problems that would support a functional impairment from a cardiological standpoint. *Id.* (citing A.R. at 475–80, and A.R. at 549). Furthermore, although Madden pointed to fatigue and persistent joint pain as reasons why he could not return to work, *id.* (citing A.R. at 114), a peer review from a physician specializing in orthopedics and pain

management found that Madden's file lacked the documentation from orthopedists and physiatrists that would support a finding of functional impairment preventing him from working in any occupation, *id.* at 6 (citing A.R. at 535, 542, 679). In light of these considerations, it must be said that the Administrator's decision was a reasoned one, which in turn means that the decision was not arbitrary and capricious. *See Davis*, 887 F.2d at 693 (6th Cir. 1989).

Madden, however, argues that the Administrator's decision was arbitrary and capricious because there was evidence indicating that he was disabled. Even if this is true, it does not render the Administrator's decision arbitrary and capricious. An administrator is not required to find in favor of a claimant simply because there is evidence that could support such a decision. *See Bolling v. Eli Lilly & Co.*, 990 F.2d 1028, 1029–30 (8th Cir. 1993) ("The Committee did not abuse its discretion merely because there was evidence before it that would have supported an opposite decision. When the conflicting evidence before the Committee is viewed deferentially, we cannot say the Committee's decision denying Bolling benefits was unreasoned."). Instead, the administrator's job is to weigh the evidence and come to a reasoned decision. This duty was fulfilled here because the Administrator considered all of the evidence, including the recommendations of Madden's treating physicians, and made a reasoned decision that Madden was not disabled based on all of the evidence. The fact that there may have been evidence supporting the plaintiff does not make the Administrator's decision any less reasoned. By the same token, the Administrator's decision is not rendered arbitrary and capricious simply because Madden had received a favorable Social Security determination. *See Glenn v. MetLife*, 461 F.3d 660, 669 (6th Cir. 2006), *aff'd*, 128 S. Ct. 2343 (2008) ("That MetLife apparently failed to consider the Social Security Administration's finding of disability in reaching its own determination of disability does not render the decision

arbitrary *per se*, but it is obviously a significant factor to be considered upon review.").

Madden also argues that the Administrator's decision was arbitrary and capricious because the Administrator relied on the recommendations of physicians who had simply reviewed his medical files rather than actually examining him. R. 19 at 6. This argument is unavailing as well. There is no question that this Court should consider the fact that the physicians conducted file reviews rather than physical exams. And while the failure to conduct a physical examination "may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295–96 (6th Cir. 2005). Furthermore, Madden has not presented evidence showing that the review by these doctors was in any way inadequate, and the Administrator's reliance on a file review, standing alone, is not sufficient for a court to conclude that the determination was arbitrary and capricious. *See id.* at 295.

While Madden disagrees with the Administrator's ultimate decision, he fails to point to anything to establish that the Administrator's decision was not a "reasoned" one. *See Davis*, 887 F.2d at 693 (6th Cir. 1989) (explaining that when there is a reasoned explanation based on the evidence for the decision, it is not arbitrary or capricious). Instead, he simply argues that—in his estimation—he is "more" disabled than he has been for the entire time period over which he received benefits. His belief, however, standing alone does not establish that the recommendations of seven physicians should be completely disregarded. Nor, more importantly, does it establish that the Administrator's reliance on these physicians was unreasonable.

In short, the Administrator had evidence from which it rationally concluded that Madden was no longer disabled under the Plan. *See Williams*, 227 F.3d at 712 (explaining that when a decision

9

is rational in light of a plan's provisions, it is not arbitrary or capricious). Because Madden has not demonstrated that the Administrator's reliance on such evidence was unreasonable, this Court must affirm the Administrator's decision. *See id.*

Accordingly, it is ordered as follows:

(1) The defendant's administrative decision terminating the plaintiff's benefits is **AFFIRMED**.

(2) The plaintiff's Motion for Summary Judgment, R. 19, is **DENIED**.

(3) This matter is **DISMISSED** and **STRICKEN** from the Court's active docket.

(4) Judgment shall be entered contemporaneously with this Memorandum Opinion and Order in favor of the defendant.

This the 5th day of February, 2009.

Signed By:
*Amul R. Thapar* AT
United States District Judge